UNITED STATES, (BELLHOUSE LOUVER WINDOWS, PARTY IN INTEREST) *v.* PITTSBURGH PLATE GLASS CO. (No. 4891) [1]

[1] C. A. D. 646.

United States Court of Customs and Patent Appeals, March 29, 1957

*John D. Rode (Ellsworth F. Qualey* of counsel) for Bellhouse.
*Barnes, Richardson & Colburn (Joseph Schwartz* of counsel) for appellee.

[Oral argument February 12, 1957, by Mr. Qualey and Mr. Schwartz]

Before Johnson, Chief Judge, and O'Connell, Worley, Rich, and Jackson (retired), Associate Judges

Rich, Judge, delivered the opinion of the court:

This is an appeal by Bellhouse Louver Windows, importer, herein called "the party in interest," from a judgment of the United States Customs Court sustaining the protest filed by an American manufacturer, Pittsburgh Plate Glass Co., under section 516 (b) of the Tariff Act of 1930, as amended, against the classification by the Collector of Customs at Tampa, Florida, of certain glass articles under the provisions of paragraphs 219 and 224 of the Tariff Act of 1930, as modified, as sheet glass, beveled.

The American manufacturer, appellee here, claimed that the merchandise should be classified and assessed with duty as manufactures of glass, not specially provided for, under the provisions of paragraph 230 (d) of the Tariff Act of 1930, as modified.

The paragraphs of the Tariff Act of 1930 here involved are as follows:

Paragraph 219

"Cylinder, crown, and sheet glass, by whatever process made, and for whatever purpose used:

| | |
|---|---|
| Not over 384 square inches | 0.8¢ per lb. |
| Over 384 but not over 864 square inches | 1¢ per lb. |
| Over 864 but not over 2400 square inches | 1.3¢ per lb. |
| Over 2400 square inches | 1.6¢ per lb. |

Provided, That none of the foregoing weighing under 16 ounces but not under 12 ounces per square foot shall be subject to a less rate of duty than _____ 20% ad val."

Paragraph 224

"Plate, rolled, cylinder, crown, and sheet glass, and glass mirrors over 144 square inches in size, by whatever process made, when bent, frosted, sanded, enameled, beveled, etched, embossed, engraved, flashed, stained, colored (except glass not plate glass and not under ¼ inch thick, when obscured by coloring prior to solidification), painted, ornamented, or decorated, shall be subject to a duty of_____ 2½% ad val. in addition to the rates otherwise chargeable thereon."

Paragraph 230 (d)

"All glass, and manufactures of glass, or of which glass is the component of chief value, not specially provided for (except broken glass or glass waste fit only for remanufacture, and except pressed building blocks or bricks, crystal color, and pressed and polished but undecorated wares)_____ 25% ad val."

The specific imported merchandise, which is all we are concerned with here, is quite accurately described by the terms in which it was invoiced, namely "Belgian Glass Louvers for jalousies. Two Long Edges Webered Round Smoothed, Two Short Edges as Cut, ⁷⁄₃₂″ Thick, 34″ x 5″." To complete the description it will be sufficient to say, what is probably quite well known, that a "jalousie" is a type of window which has come into vogue during the past decade and is made of glass slats or louvers generally mounted horizontally for rotation about their long axes in a metal frame carrying the slab-supporting and operating mechanism in which the slats are supported by their ends. The record shows that until recently the bulk of jalousie sales have been in the State of Florida where the industry has consumed many millions of glass slats. As to the term "webered," many witnesses testified to the effect that it is a type of edge finish or working produced on a Weber machine or its equivalent in which the cut edge of a piece of glass is ground by abrasive elements, apparently wheels, to produce what was described as a "pencil edge" or "pencil polished edge," which is a rounded edge. Exhibits corresponding to the imported merchandise were described as having a "satin finish, webered edge," particularly well suited for jalousie window use. An edge "as cut," which was the condition of the ends or short edges of the imported louvers, is simply the square edge of a piece of glass cut by the usual scoring and breaking operation which leaves sharp corners. These can be ground off to eliminate the danger of cutting by another process known as "seaming" or "swiping" which is the removal of the sharp corners on a moving abrasive belt or wheel.

To sum up as to the condition of the imported merchandise, it is ⁷⁄₃₂″ glass slats 34″ x 5″ with the two long edges webered, rounded, with a satin finish and the ends as-cut. The testimony clearly shows that this particular size of louver is a completely finished jalousie louver ready for installation in a popular size of jalousie window. On

this point there appears to be no real dispute. The Customs Court in sustaining the protest held that,

> * * * the great preponderance of the testimony, including the exhibits, indicates, in our opinion, that the imported louvers, in their condition as imported, had lost their character as sheet glass and had become louvers, made or manufactured for a particular purpose, that is, for installation in jalousie windows.

> * * * the facts in this case clearly establish that the imported glass louvers were dedicated to an exclusive use, to wit, for installation as parts of window jalousies, * * *

The parties have waged a hard-fought battle, producing nearly 200 pages of testimony, which we have carefully reviewed, over the issue succinctly stated at one point in the trial by the attorney for the party in interest as follows:

> One of the points that I must establish, or at least defend, is that this merchandise as imported is not dedicated to one single use of making jalousie windows.

To this end a strenuous effort was made to show that the imported merchandise was usable and used as counter-dividers and also as glass shelves, in medicine cabinets primarily. One other use, in making glass picture frames, was shown which we shall dispose of first.

The party in interest produced one witness who had purchased what, on the evidence, we feel constrained to call jalousie louvers 3½'' and 4'' wide and 36'' long (not the size of the imported merchandise) having two long webered edges and clean-cut ends, split them down the middle to get strips of suitable length and shape to construct a sort of shadow-box effect on glass picture frames, the pieces being drilled and decorated with cut or ground surface ornamentation, as shown by an exhibit in evidence. The other edges, resulting from this cutting of the louvers, he seamed.

We see absolutely nothing in this evidence which would tend to take the merchandise out of the category of "manufactures of glass" assuming it to be in that category, and put it in the "sheet glass" category. We shall resist the temptation to enumerate examples of manufactured articles which can be cut up and by further processing made into something else. All the witness did was to hit on the happy thought that by starting with fully manufactured jalousie louvers he could save some labor in that he acquired a source of glass strips with one edge already webered, by buying one manufacture of glass and converting it into another.

One of the main points argued on behalf of the party in interest is that "Merchandise *of the type* imported is material only *for* the manufacture of finished articles." (Emphasis ours.) The two main lines of evidence offered on this point related to use of this type of glass for counter-dividers and shelves, particularly shelves for medicine cabinets. We find no evidence that glass slats exactly like

(rather than of the type of) the imported merchandise have ever been used for anything but jalousie louvers. Furthermore, the party in interest impliedly admits that what was imported was jalousie louvers in saying, "If at * * * the point where two long edges are webered, the processing is stopped, the merchandise is suitable for use as jalousie glass." This contradicts the argument above stated, for it is an admission that the imported glass was not "only *for* the manufacture of finished articles" but was itself a finished article.

The evidence on use for medicine cabinet shelves is to the effect that most such shelves are not glass of the type imported at all but are ⅛" glass with a bulb-edge on one long side, the other three edges being as-cut; that some higher grade cabinets have shelves of the thickness of the glass imported, but not of the same width or length. The party in interest's own witness, who had been in the medicine cabinet business since 1950, testified that what he used for shelves was "a common jalousie slat." He said, "Ones that I use are made for jalousie doors. It is a standard width for a jalousie door. I can buy it less expensive that way." This does not support the contention that the imported merchandise was sheet glass for the manufacture of various articles, including shelves. It merely shows, to our way of thinking, that it was glass already manufactured into jalousie slats which this witness chose to put to another use. The sizes he used were 3" and 3½" in width and 23", 25" and 30" in length. He admitted that he had never used a size corresponding to that of the imported merchandise.

On the use of glass slats with two long webered edges and as-cut ends as counter-dividers, the preponderance of the evidence clearly shows that for safety reasons all four edges of counter-dividers must be finished in some manner, by webering, seaming or the like, and the corners rounded. There is little question in our minds that if one wanted to make counter-dividers out of what had already become finished jalousie louvers, it could be done by further processing of the as-cut ends. But this does not change the classification status of the louvers. Disregarding the evidence on the necessity of finishing all edges, it may even be that merchandise of the type imported, or the imported merchandise itself, could be used without change as counter-dividers. This is but to give the article another use and another name and in no way shows that it is not a manufacture of glass and merely sheet glass *for* the manufacture of finished articles.

In the view we take of the case, it is of no moment that either the imported articles themselves or articles of the same type but of different size can be put to different uses, as jalousie slats, as shelves or as counter-dividers, where they are put to such use without further change. In a closely analogous situation this court, in *Atlas Export*

*Co., et al.* v. *United States,* 43 C. C. P. A. (Customs) 122, C. A. D. 618, held that squares or circles of onyx, polished on one flat side and all edges, with a hole drilled in the center and of several sizes, was not "onyx—polished" but "onyx—partly manufactured into—articles," saying, "It is abundantly clear that 'dedication' to a specific use is not essential to classification under" the latter provision. In short, a partly manufactured article or a manufacture remains such though it be proved to have multiple uses.

The party in interest made one other contention in an attempt to show the imported merchandise was only *for* the making of other articles and not itself a manufacture under paragraph 230 (d). Testimony was adduced by some jalousie manufacturers that they had to shorten the slats they bought to make them fit their windows which the stock sizes of slats did not fit and they purchased the next longer size and cut off a piece. The evidence shows that jalousie louvers generally—not the specific imports—are made in a variety of widths and lengths. Or, in some cases, a window would get out of true and some slats would have to be fitted. Also one top slat, apparently one in a fixed position, might be split longitudinally for insertion in the frame. We cannot regard these fitting operations as having any effect on the classification of the merchandise. Clearly large quantities of slats were used as purchased for insertion in frames built to fit them, obviously the most economical way to manufacture jalousie windows.

Many of the witnesses, as the party in interest admits, testified that there was no other practical or commercial use for the imported merchandise than as jalousie louvers.

It remains for us to decide specifically whether the above described imported glass slats are, in the eyes of the law, "manufactures of glass." The Customs Court held they were on the ground that they were dedicated to an *exclusive* use as parts of jalousie windows. In view of the evidence, which we have summarized above, we think the fact finding of dedication to an exclusive use as to the specific imported merchandise should not be disturbed because good and sufficient reason has not been shown for doing so. *Robinson-Wagner Co., Inc.* v. *United States,* 40 C. C. P. A. (Customs) 80, C. A. D. 501; *United States* v. *Flexideal Dry Mat Co.,* 23 C. C. P. A. (Customs) 270, T. D. 48113. But furthermore, in *Konishi Kotakuda Co. (Inc.)* v. *United States,* 17 C. C. P. A. (Customs) 335, T. D. 43798, this court held that imported unpolished pieces of glass of many shapes and sizes, bent into concavo-convex forms and shown to have been put to three different uses were nevertheless "manufactures of glass" rather than "cylinder glass, bent." The reasoning voiced in the minority's

concurring opinion in that case we deem controlling in the present circumstances:

> To be a manufacture of a thing, it must have been processed from the original material to [a point] where it has a new name, new characteristics, or a new use different from that which characterized the original component material—processing controls.

The imported glass louvers were clearly no longer merely sheet glass. They may have been beveled. We have doubts on that subject since a round webered edge does not seem to us to be a bevel; but we express no view on this point as it was not argued. They had a new name, or several names such as "jalousie louvers," "jalousie slats," "louver glass," "louver slats," "jalousie strips" and "glass louvers," by all of which the trade witnesses referred to them. As such they were bought and sold. The new characteristics were two webered, round, smooth edges and a specific size. The new use was as jalousie louvers, at least predominantly. As such, they were completely manufactured articles, hence "manufactures of glass" classifiable under paragraph 230 (d).

The decision of the Customs Court is *affirmed*.

JACKSON, J., Retired, recalled to participate herein in place of COLE, J., absent because of illness.